UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION -- LEXINGTON

| | |
|---|---|
| **PREFERRED CARE, INC., et al.**  Plaintiffs,  V.  **JUDY BARNETT, as administrator of Donald Shelton's estate,**  Defendant. | CIVIL ACTION NO. 5:16-372-KKC  **OPINION AND ORDER** |

This matter is before the Court on the plaintiffs' motion to compel arbitration (DE 9) and the defendant's motion to dismiss (DE 6). For the following reasons, the Court will grant the motion to dismiss and deny the motion to compel.

**I.  Background**

Donald Shelton died after residing at the Stanton Nursing and Rehabilitation Center located in Stanton, Kentucky. The administrator of his estate, Judy Barnett (the "Estate"), filed suit in Powell Circuit Court against the nursing center and multiple other companies that the Estate alleged owned or operated the center. The Estate also named the center administrator and the director of nursing at the center as defendants in the state-court action.  (DE 1-2, State Court Action.)

The center and three of the companies named as defendants in the state-court action (collectively, the "Center") then filed this action, asking this Court to order the Estate to arbitrate the claims filed in the state court action and to enjoin the Estate from pursuing the state-court action. The Estate moves to dismiss this federal action.

II.  Analysis

   A. Jurisdictional issues

The Court must, of course, first address any challenges to its jurisdiction. The Estate concedes that this Court has diversity jurisdiction over this action but argues that the Court should abstain from exercising it under the *Colorado River* doctrine. Under that doctrine, "[i]n certain 'exceptional' circumstances, [ ] a federal district court may abstain from exercising its subject matter jurisdiction due to the existence of a concurrent state court proceeding, based on 'considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Paine Webber, Inc. v. Cohen*, 276 F.3d 197, 200 (6th Cir.2001) (quoting *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976)). But "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule," and this "extraordinary and narrow exception" is only justified when it "would clearly serve an important countervailing interest." *Colorado River*, 424 U.S. at 813.

Neither party addresses it but the first issue on the abstention analysis is whether there is, in fact, a parallel state court proceeding. While for purposes of *Colorado River* abstention, the state and federal proceedings need only be "substantially similar," *Romine v. Compuserve Corp.*, 160 F.3d 337, 340 (6th Cir. 1998), the two actions cannot be said to be parallel if the claims presented in this Court are not presented in the state court action at all. There is no evidence in the record before this Court that either party has moved to compel arbitration in the state-court action. Nor is there any evidence indicating that either party has actually asked the state court to determine whether the arbitration agreement is valid and, if so, whether the agreement requires that the Estate's state-court claims be arbitrated. Nothing in the record before this Court indicates that any of the parties to this action have requested the state court to make any determinations regarding the arbitration agreement or the arbitrability of the

Estate's state-law claims. Accordingly, the Court cannot find that this action and the state-court action are parallel.

Furthermore, even if a party had moved the state court to compel arbitration, the Court could not find abstention warranted. "[T]he decision to dismiss a federal action because of a parallel state-court action rests 'on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction.'" *Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 886 (6th Cir.2002) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 16 (1983)).

Courts consider roughly eight factors when determining whether abstention under Colorado River is necessary. *PaineWebber*, 276 F.3d at 206 (citing *Romine*, 160 F.3d at 340–41). These factors are:

> (1) whether the state court has assumed jurisdiction over any res or property;
> (2) whether the federal forum is less convenient to the parties;
> (3) avoidance of piecemeal litigation; . . .
> (4) the order in which jurisdiction was obtained[;] . . .
> (5) whether the source of governing law is state or federal;
> (6) the adequacy of the state court action to protect the federal plaintiff's rights;
> (7) the relative progress of the state and federal proceedings; and
> (8) the presence or absence of concurrent jurisdiction.

*Id.* (citing *Romine*, 160 F.3d at 340–41).

The first and second factors favor this Court exercising jurisdiction in this action. There is no res. And, given the proximity of the two courts, this federal forum is just as convenient to the parties as the Powell Circuit Court. The Estate makes only one argument with regard to convenience. It argues that the arbitration agreement mandates that any action to compel arbitration be filed in the Kentucky state court. This argument goes to whether this action should be dismissed under the doctrine of *forum non conveniens*. The Court will address this question after deciding whether to exercise jurisdiction in this action. For purposes of determining whether to abstain from exercising its jurisdiction under *Colorado River*, however,

3

a provision requiring that motions to compel arbitration be filed in state court does not render this forum so inconvenient that the Court should find that an exception exists to its obligation to exercise jurisdiction.

As to the fourth and seventh factors, they again favor the exercise of federal jurisdiction. The state court action was filed before this but there is no evidence in this record that the state court has been asked to address the arbitration issue at all.

The "most important" factor is the third factor, which asks "whether there is a 'clear federal policy evinc[ing]. . . the avoidance of piecemeal adjudication' found within the statutory scheme at issue." *Answers in Genesis of Kentucky, Inc. v. Creation Ministries Int'l., Ltd.*, 556 F.3d 459, 467 (6th Cir.2009) (quoting *Colorado River*, 424 U.S. at 819). The Sixth Circuit has held that "[i]n the case of the Federal Arbitration Act, there most clearly is not such a policy." *Id*. at 467. This is because the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*. ("FAA") "requires district courts to compel arbitration . . . when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." *Id*. at 467–68. Thus, the most important factor when determining whether to exercise this Court's jurisdiction weighs in favor of doing so.

The fifth and eighth factors also weigh in favor of exercising jurisdiction. This Court has jurisdiction over the issue presented in the complaint. The Estate disputes whether the FAA or the Kentucky Uniform Arbitration Act governs this dispute. Regardless, this Court is capable of applying either law. The sixth factor weighs in favor of exercising jurisdiction because the state court has not been asked to protect the Center's arbitration rights. Considering all of these factors, the Court will not abstain from exercising its jurisdiction over this action.

B.     Venue

As discussed, the Estate argues that the arbitration agreement at issue contains a provision that requires that any motion to compel arbitration be filed in the Powell Circuit

Court. Relying solely on that provision, it argues that this action must be dismissed under the *forum non conveniens* doctrine. *See Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 580 (2013) (stating that "the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*.")

The Center argues that the agreement does not contain a forum-selection clause at all. Whatever the clause is labeled, it states that the agreement is "governed by the terms of the Kentucky Uniform Arbitration Act, which is set forth at KRS § 417.045, *et seq.*" (DE 1-1, Agreement § 5.) The Kentucky Uniform Arbitration Act ("KUAA"), in turn, requires that, "[i]f an issue referable to arbitration under the alleged agreement is involved in an action or proceeding pending in a court having jurisdiction to hear applications [to compel arbitration], *the application shall be made therein.*" KRS § 417.060(3) (emphasis added).

The arbitration agreement also provides, "[i]f for any reason there is a finding that Kentucky law cannot support the enforcement of this Agreement, then the parties agree to resolve their disputes by arbitration. . . pursuant to the Federal Arbitration Act." (DE 1-1, Agreement, § 5.) At this point there has been no finding that Kentucky law cannot support the enforcement of the arbitration agreement. By its plain language then, the arbitration agreement provides that, absent a finding that the agreement cannot be enforced under Kentucky law, the KUAA is controlling and requires that any motion to compel be filed in the state court action. *See Jumara v. State Farm Insurance Co.*, 55 F.3d 873, 882 (3d Cir. 1995) ("[B]y incorporating the [Pennsylvania Uniform Arbitration Act], the insurance contracts between the Jumaras and State Farm dictate that actions to compel arbitration be made to 'a court of record' of Luzerne County. . . .").

The Center does not address the substance of the venue provision of the KUAA. It does not dispute that the KUAA requires that any motion to compel arbitration be filed in the court where the underlying tort action is proceeding. Nor does the Center argue that enforcement of

5

the KUAA provision in the arbitration agreement would be unreasonable or unjust or that the provision is invalid because it was the product of "fraud or overreaching." *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 15 (1972).

Accordingly, if not for the Estate's argument that Shelton lacked the mental capacity to sign the arbitration agreement, the Court would dismiss this action so that any motion to compel arbitration would be filed in the state court where the underlying tort action was filed as required by the KUAA. This was clearly the intent of the parties. The Powell Circuit Court would then decide whether the parties agreed to arbitrate the claims in the underlying tort action.

The problem for the Estate, however, is that it, while it seeks to enforce the KUAA provision of the arbitration agreement, it also argues that Shelton lacked the mental capacity to sign the arbitration agreement. Before enforcing the KUAA provision of the agreement, the Court must determine whether Shelton had the mental capacity to enter into the agreement at all.

It is true that, where a party claims that an entire contract is not enforceable because of fraud or misrepresentation, courts will still enforce a forum-selection clause in the agreement. *Arnold v. Arnold Corp.-Printed Commc'ns for Bus.*, 920 F.2d 1269, 1277-78 (6th Cir. 1990). As with an arbitration clause, in order to defeat a forum-selection clause, the allegation of fraud must be directed at the forum-selection clause itself, not the agreement as a whole. *Id.* at 1278. *See also Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1296 (11th Cir. 1998); *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 & n.14 (1974) (stating that an arbitration clause is, in effect, a "specialized kind of forum-selection clause" and that "an arbitration or forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion.").

The Estate does not claim, however, that the arbitration agreement is unenforceable because of fraud. It alleges that the agreement is not enforceable because Shelton lacked the mental capacity to sign it. Challenges based on capacity are different than challenges based on fraud. Where a party alleges he was fraudulently induced to enter into a contract, he does not challenge the existence of the agreement but instead challenges its validity. Where, on the other hand, a party argues he did not have the capacity to enter into an agreement, he challenges whether any agreement ever existed at all. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n. 1 (2006) ("The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded."). *See also Rowan v. Brookdale Senior Living Communities, Inc.*, 647 F. App'x 607 (6th Cir. 2016) (deciding that resident had mental capacity to sign agreement before enforcing arbitration clause); *Abell v. Bardstown Medical Investors, Ltd.*, No. 3:11-cv-86, 2011 WL 2471210 (W.D. Ky. 2011) (same).

Accordingly, before enforcing any provision of the arbitration agreement, including the KUAA provision, the Court must first determine whether Shelton had the capacity to enter into it. The court, rather than a jury, decides disputed fact issues relating to venue. 14D Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Juris. § 3826 (4th ed.) *See also Atl. Marine Const. Co.*, 134 S. Ct. at 580 n.4 (indicating that issues of material fact on motions under the doctrine of *forum non conveniens* relating to the validity of a forum-selection clause are not resolved by a jury). Thus, solely for the purposes of determining the threshold issue of whether this Court is an appropriate venue for the motion to compel arbitration, the Court will make a finding as to Shelton's capacity to enter into the arbitration agreement.

Capacity is analyzed under state law. *See Rowan*, 647 F. App'x at 609. Under Kentucky law, a signed contract "will not be lightly set aside in the absence of clear and convincing evidence." *Lausman v. Brown*, 168 S.W.2d 579, 585 (Ky. 1943). A transaction with a person not yet adjudicated mentally unsound will not be voided "unless the condition be so obvious that

7

any and all ordinarily prudent minded persons would observe the defect." *Everett v. Downing*, 182 S.W.2d 232, 236 (Ky. 1944). There is a presumption of contractual capacity. *Rose v. Rose*, 182 S.W.2d 977, 978 (1944). "There must be some direct proof sufficient to convince the minds of the court that at the time the transactions were entered into that he did not and could not understand his acts." *Revlett v. Revlett*, 118 S.W.2d 150, 155 (Ky. 1938).

Evidence of "unsoundness of mind to avoid a contract must relate to the immediate time when the contract was made." *Hall v. Crouch*, 341 S.W.2d 591, 594 (Ky. 1960) (quoting *Jefferson Standard Life Ins. Co. v. Cheek's Adm'r*, 80 S.W.2d 518, 521 (1935)). ) This is "[b]ecause the law understands that individuals suffering from conditions such as psychosis have lucid periods in which they can conduct themselves and their business normally." *Abell v. Bardstown Med. Inv'rs, Ltd.*, No. 3:11-CV-86-H, 2011 WL 2471210, at *3–4 (W.D. Ky. June 20, 2011).

This is certainly true in Shelton's case. At the time he signed the arbitration agreement, the Center staff determined that he was not capable of self-administering medications because his cognition level "fluctuate[d]." (DE 6-5, Request for Admission Form.) He came to the Center after a state social worker visited Shelton on August 3, 2012 and reported that tall weeds practically covered the entrance to his home. (DE 6-18, Assessment Form at 3.) She reported that she entered the home and found Shelton "extremely weak and dirty." The home was "infested with roaches . . . spiders, bugs, cats, smell of urine, feces . . . ." The home had no electricity, water, or gas. At that time, Shelton was 75 years old, "thin and smelled horrible." He had feces on his body and clothes. He "appeared confused at times" and "talked about going to Florida to build churches and get $1,000,000.00 that the government owes him." He was unable to stand for long periods of time due to weakness

The social worker reported that Shelton had "delusional thoughts and a history of alcohol and drug[] abuse." (DE 6-18, Assessment Form at 6.) Shelton told the social worker that he had not had a full meal in three months and was currently eating from garbage cans. He told

the social worker that he and a friend search dumpsters for aluminum cans that they sell for food and cigarettes. (DE 6-18, Assessment Form 5.) The social worker stated that Shelton displayed "various mental dysfunctions." (DE 6-18, Assessment Form at 6.)

But Shelton reported his birthdate and place, social security number, and current address to the social worker. (DE 6-18, Assessment Form at 5.) He was also able to report to the social worker that he received monthly checks from social security of $694 and $500 but stated he was not currently receiving any checks because he owed a total of $900 to a company called Check in Advance. He reported that he had a checking account and was able to report his checking account number. After Shelton received treatment at a local hospital, the social worker recommended that his case be closed because he has "decisional capacity and is in a safe place." (DE 6-18, Assessment Form at 3.)

By August 17, 2012, Shelton was located at the Center. The Center's social services director and admissions coordinator, Brenda Kiernan, reported that Shelton had been in a phone conversation that day with the Social Security office regarding his checks. She further reported that, "if you just talk with him briefly he seems fairly cognitively intact . . .however he has some delusional thinking going on." (DE 6-18, Assessment Form at 11.) On August 19, Shelton scored a14 out of 15 on a required screening tool utilized by nursing home personnel to assess patient cognition. (DE 8-5, BIMS score.) On August30, a physician diagnosed Shelton with a failure to thrive, urinary tract infection, restless leg syndrome, COPD, chronic smoker, primary tremor, abnormality of gait, past alcoholism and bipolar disorder. The physician did not indicate that Shelton had any condition that rendered him unable to understand his actions. (DE 6-8, August 30, 2012, Physician's Orders.)

Given the evidence that Shelton's cognition fluctuated during the relevant time period, the Court will, as the law requires, focus on the evidence of Shelton's cognition at the time that he signed the arbitration agreement. He signed the agreement on August 8, 2012. A nurse from

a home health agency visited Shelton at his home that day and found that Shelton's thought processes were "off really bad." (DE 6-18, Notes at 11.) She stated that the agency would not render service at Shelton's home "due to the safety in the home for her staff and the aggressive behavior from Mr. Shelton." The social worker paid a follow up visit to Shelton on that date and Shelton agreed to stay 30 days at a nursing home to give the social worker time to find him a safe place to live.

At the time that Shelton signed the nursing home admission form, while he did not know the date or time, he knew his name, his location, and the Center staff. He understood verbal direction. (DE 6-5, Request for Admission form.) The Center's social services director and admissions coordinator, Kiernan, performed a pre-admission screening of Shelton and concluded Shelton did not have a major mental disorder or mental retardation. (DE 8-4, Screening.) In an affidavit submitted by the Center, Kiernan states that she believes Shelton "was cognitively intact" on the date he signed the agreement and that he would have understood it. (DE 9-7, Aff. at 2.)

Nothing in the screening indicates that, at the time Shelton signed the arbitration agreement, he was unable to understand it. There is no opinion – professional or otherwise – to that effect in the record. Accordingly, the Court cannot find that the Estate has met its burden of establishing by clear and convincing evidence that Shelton lacked the mental capacity to enter into the agreement at the time of execution.

Accordingly, the Court will enforce the KUAA provision in the arbitration agreement requiring that any motion to compel arbitration be filed in the Powell Circuit Court and will dismiss this action. *See also Atl. Marine Const. Co.*, 134 S. Ct. at 580 (stating that the "traditional remedy" under the doctrine of *forum non conveniens* is "outright dismissal").

### III. Conclusion

For all these reasons, the Court hereby ORDERS as follows:

1) the motion to dismiss (DE 6) is GRANTED;

2) the motion to compel arbitration is DENIED (DE 9); and

3) this action is DISMISSED and STRICKEN from the Court's active docket.

Dated February 16, 2017.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY